UNITED STATES                :            16 Cr. 154 (KBJ)

v.                               :

LUZ IRENE FAJARDO CAMPOS    :

Defendant.                 :

## DEFENDANT'S MOTION TO SUPRRESS
### INTERCEPTED ELECTRONIC COMMUNICATIONS

## INTRODUCTION

From April 24, 2013 until approximately September 2015, defendant Luz Irene Fajardo Campos was the target of a Title III "electronic" wiretap. The twenty-nine month long investigation was conducted by federal prosecutors in Washington, D.C. under the auspices of the United States District Court for the District of Arizona. At the time of its inception and as part of each request to extend and/or expand the wiretap, the Government argued that the wiretap was "necessary" because other investigative procedures would be unlikely to succeed or would be too dangerous to attempt. See 18 United States Code Section 2518(1)(c).

For two independent – but equally compelling reasons - this Court should conclude that the electronic communications obtained by the Government were "unlawfully intercepted" and order their suppression. See 18 United States Code Section 2510(10)(a)(i).

First, the wiretap was not - and could not have reasonably been deemed - necessary at the time of its inception because alternative investigative techniques were not merely available, but were already in use. By the time the Title III wiretap began, the Drug Enforcement Administration had "two active confidential sources available to further the investigation," who were in direct contact with the defendant. Moreover, the Mexican government had been

1

conducting its own, independent wiretap of defendant Fajardo Campos's telephone since October 24, 2012 and was sharing the results with the DEA. Mexican law enforcement authorities had conducted surveillance against alleged co-conspirators in Mexico and the DEA had maintained "constant surveillance" of a co-conspirator in the United States who was allegedly involved in laundering drug proceeds. The United States had also obtained a search warrant for the defendant's email account. Under these circumstances, even given the deference due to the issuing court's decision to approve the wiretap, it is impossible to see how the interceptions were "necessary," as the term is used in the statute. See United States v. Suggs, 531 F.Supp.2d 13, 18 (D.D.C. 2008)(issuing judge's finding of necessity reviewed for "abuse of discretion").

Second, Title III expressly provides that a federal judge may issue an order authorizing a Title III interception only "within the territorial jurisdiction of the court in which the judge is sitting . . . ." 18 United States Code Section 2518(3). In this case, the Arizona district court authorized the interception of wired communications that were "captured at the Blackberry Corporation's server located in Texas," in clear violation of the statute. Because the initial application was obtained in violation of Title III's requirements, every subsequent order and/or extension of the wiretap must be suppressed. See United States v. Giordano, 416 U.S. 505, 230 (1974)("the communications intercepted pursuant to the extension order were evidence derived from the communications invalidly intercepted pursuant to the initial order" and as "derivative evidence must be suppressed").

## FACTUAL BACKGROUND

The following summarizes the relevant factual representations made in the various applications submitted to the Arizona district court in support of the wiretap application and/or

extensions. [1]

**April 24, 2013 Application**

On April 24, 2013, the Department of Justice submitted its initial application to the United States District Court for the District of Arizona to approve the interception of "electronic communications," such as blackberry messages, emails, or text messages, from a telephone (referred to as Target Device #1), allegedly being used by defendant Luz Irene Fajardo Campos, (also allegedly known as "La Comadre"). [2]

The affidavit submitted in support of the April 24, 2013 request alleged that:

*In January 2012, DEA, FBI and IRS agents initiated an investigation into a drug trafficking organization ("DTO") operating in Mexico and Tucson, Arizona, among other places. To date, this investigation has revealed that FAJARDO is a leader of the DTO, which is responsible for trafficking tonnage quantities of cocaine, methamphetamine, and marijuana into the United States from Mexico. This DTO is also responsible for transporting large amounts of United States currency back to Mexico. As detailed further below, FAJARDO negotiates the purchase of large quantities of illegal drugs from source countries, such as Colombia, and the subsequent transportation of illegal drugs to transshipment points, such as Panama, Honduras, Guatemala, and Belize, before the drugs are imported into Mexico and the United States.*

The initial affidavit identified sixteen alleged members of the organization by their full legal name and/or nickname and noted that the DEA was already working with two informants who were in contact with the defendant:

*Agents currently have two active confidential sources available to further this investigation. Both sources have provided historical information regarding FAJARDO and her drug trafficking and money laundering activities. [An accompanying footnote stated that:] To date, the information provided by [CS-1 and] CS-2 has been reliable and*

---

[1] Each wiretap application was accompanied by a Proposed Order and supporting affidavit. These materials comprise approximately 4,000 pages of text and were provided to the defense under a Protective Order. In the interests of efficiency, the defense is contemporaneously filing with the Court under seal as Exhibit 1, a copy of only the first affidavit in support of the Title III interception.

[2] Under Title III, electronic communications such as text or blackberry messages are different than "wire communications," which are defined as "aural transfers." 18 U.S.C. Section 2510(1). In essence, wire communications are those that include the human voice; electronic communications are in writing or contain data. The wiretap in this case involved only electronic communications.

*corroborated by other source information and judicially authorized interceptions in Mexico.*

Moreover, the DEA was continuing to recruit other informants, noting that *"[a]gents are currently cultivating the assistance of other potential confidential sources in the investigation. . ."*

The affidavit also confirmed that for more than five months, the Mexican Government had been conducting its own interception of telephones actively used by defendant Fajardo Campos:

> *On October 24, 2012, the Honorable ███████████████, a federal judge in Mexico, authorized interception of the Mexican telephone assigned ████████. The interceptions were judicially reauthorized on January 25, 2013, and the current authorization will expire on April 28, 2013. The telephone is being used by Target Subject FAJARDO. Interceptions are ongoing.*

The agent's affidavit liberally quotes from conversations intercepted by the Mexican authorities and notes that these intercepts *"have assisted agents in identifying several members of FAJARDO's DTO."* The agent also explained that *"at the direction of the agents,"* cooperating witness 1 allegedly exchanged blackberry communications with the defendant over Target Device #1. The affidavit in support of the Title III interception request then summarizes multiple conversations between Target Device #1 and the cooperating witness from December 2012 through February 2013. Assuming *arguendo* that the Government could establish that defendant Fajardo Campos was the person in contact with the confidential informants, the information already in the DEA's possession at the commencement of the wiretap appears more than adequate to demonstrate her culpability. But there was more.

The affidavit acknowledges that *"Mexican law enforcement has conducted physical surveillance as part of its investigation. . . . "* As the result of this surveillance

> *Mexican law enforcement officers surveilled FAJARDO as she met with two unidentified individuals from Colombia in a public location in Hermosillo, Mexico. The Mexican law*

*enforcement officers have shared information and pictures from the surveillance with [United States] agents in this investigation.*

The Mexican police were not the only agency able to conduct surveillance. As the result of information obtained during the investigation, the DEA was able to identify members of the criminal organization who were allegedly involved in money laundering activities. The agent noted:

> *Through the course of this investigation, agents identified* ███████ *as a business associate of FAJARDO. Agents also learned in the course of this investigation, through surveillance by Mexican law enforcement and confidential source information, that the DTO controls several clothing stores within Mexico. Agents believe these stores are used to conduct trade-based money laundering for the DTO. Several DTO members have listed these businesses for reasons to enter the United States on visa applications. On March 5, 2012, agents were notified by U.S. Customs and Border Protection ("CBP") that* ███████ *had entered the United States in Nogales, Arizona. Agents subsequently conducted visual surveillance of* ███████*s vehicle and followed* ███████ *to various department stores, where he purchased copious amounts of clothing in Tucson, Arizona, Casa Grande, Arizona, and Tempe, Arizona, and eventually in Ontario, California. Agents maintained constant surveillance of the vehicle and the occupants and eventually followed the vehicle to a hotel in Los Angeles, California. On March 6, 2012, agents observed* ███████ *loading suitcases and bags of clothing into the vehicle.* ███████ *then drove the vehicle to the garment district in Los Angeles.* ███████ *was observed entering a store, and upon exiting was observed carrying a red plastic bag. The vehicle was then followed to a shipping company, where agents believe that* ███████ *shipped the purchased clothing back to Mexico.*

Finally, the affidavit stated that in January 2013, the DEA had obtained a search warrant from a federal judge in California for an email account allegedly used by defendant Fajardo Campos. The agent concluded that "*E-mails obtained through the search have confirmed FAJARDO's leadership of the DTO and her active participation in the DTO's drug trafficking activities. Specifically, e-mails show that FAJARDO has actively arranged for the procurement of aircraft and pilots for the purpose of transporting illegal drugs from South America to Mexico.*"

Despite the depth and breadth of the information already in the DEA's possession, the Government claimed that a wiretap investigation was necessary

> *Based on my training, experience, and knowledge of the facts of the investigation, I believe that the interception of electronic communications to and from the TARGET DEVICES is necessary to enable the government to achieve the objectives of this investigation. Interception is necessary because the TARGET SUBJECTS have demonstrated that they are members or associates of an organization that is actively involved in international drug trafficking, and monitoring communications is necessary for investigators to gain an understanding of the inner workings of the organization, the manner in which crimes are committed, and the identities of the participants in the organization. As discussed herein, the use of "traditional" law enforcement investigative techniques must be supplemented with electronic interception in order to ascertain the structure of the organization, identify all co-conspirators and the leaders, and gather sufficient evidence regarding all of the crimes of the international drug trafficking organization to support prosecution.*

This exact language would be repeatedly verbatim in each and every one of the succeeding twenty-eight affidavits submitted to the Court in support of extensions and additions to the wiretap.

1. **Extensions of Target Device #1**

The Government requested and received permission to extend the interception of electronic communications from Target Device #1 on May 28, 2012 and June 26, 2012. Both affidavits summarized allegedly incriminating messages sent from Target Device #1 to other alleged members of the drug trafficking organization, but also make clear that traditional law enforcement techniques continued to be successfully utilized. The May 28, 2012 affidavit noted that the DEA had conducted surveillance in the United States against other suspected money launderers for the organization. The affidavit also claimed that as the result of the wiretap, United States law enforcement had identified an airplane belonging to, or possibly used by, the targets of the wiretap. The June 26, 2012 affidavit noted that United States law enforcement had seized 2,370 pounds of marijuana that allegedly belonged to the defendant's organization. An undercover law enforcement officer took control over the truck containing the marijuana in

Arizona and drove the vehicle to Massachusetts, where members of the State Police seized the contents.

**2. Initial Application And Extensions for Target Device #7**

On July 29, 2013, the Government asked for permission to initiate a wiretap against Target Device #7, which was allegedly now being used by defendant Luz Fajardo Campos in lieu of Target Device #1. The affidavit in support of this request summarized much of the information previously provided to the issuing district court judges, for the first time explained in detail the nature and extent of cooperating witness #1's contacts with the defendant.

> *CS-1 does meet frequently in person with FAJARDO and has done so approximately eight times in the past month, and CS-1 has provided agents with significant information concerning FAJARDO's drug trafficking and money laundering activities, information that has been corroborated by interceptions of TARGET DEVICE #1. On June 19, 2013, CS-1 accompanied FAJARDO to the U.S. Embassy in Mexico City to obtain a visa for FAJARDO. According to intercepted communications over TARGET DEVICE #1 and information from CS-1, FAJARDO intends to use the visa to travel-to the United States in furtherance of her money laundering activities. While at the U.S. Embassy, FAJARDO gave CS-1 access to her telephone, at which time CS-1 obtained several cellular telephone numbers stored in the telephone.*

The affidavit also noted the possibility that a different confidential source would be used in the case, noting that the defendant was in contact with yet another DEA informant located in Belize and that *"[i]f it appears that the DEA Belize confidential source may be used to advance this investigation in the future, agents will pursue his/her cooperation."*

The request to initiate the interception of electronic communications from Target Device #7 was granted and thereafter extended on August 22, 2013; September 20, 2013; October 21, 2013; November 15, 2013; December 13, 2013; January 8, 2014; February 5, 2014; and March 5, 2014.

The affidavits requesting extension of Target Device #7 summarize the intercepted conversations from that blackberry device, but a careful review of the affidavits reveal that

standard law enforcement techniques were also used successfully by the DEA and thus, the continued interception of defendant Fajardo Campos' telephone was not "necessary" within the meaning of the wiretap statute. For example, the affidavits confirm that the DEA was using its confidential informants to undertake a proactive investigation against the defendant. The affidavit in support of the September 20, 2013 extension notes that

> *Most recently, on August 22, 2013, CS-1 met with FAJARDO and her associates in Mexico City. At that meeting, CS-1 discussed with FAJARDO the availability of aircraft for future transportation of large quantities of illegal drugs from source countries in South America FAJARDO has likewise requested CS-2's assistance regarding aircraft purchases for the purpose of transporting illegal drugs.*

Moreover, the affidavit in support of the February 5, 2014 extension of the interception against Target Device #7 noted that the DEA had obtained a second search warrant for an email account allegedly belonging to the defendant. The affidavit reported that:

> *A search warrant was obtained for [an email account] on January 17, 2014, from the Honorable ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the District of Arizona. Agents have learned through intercepts, FAJARDO utilizes this email account to coordinate aircraft documents to include; aircraft insurance, flight plans, and pilot license information in an effort to further the movement of aircraft to and from Mexico containing bulk amounts of cocaine. During the past thirty days of interception agents intercepted FAJARDO organizing a trip for Canadair Challenger based in Mexico. Agents learned that this aircraft was destined for ▮▮▮▮▮▮▮▮▮ to obtain a load of approximately 2,000- 3,000 kilograms of cocaine. Intercepts revealed that documentation pertaining to the movements of ▮▮▮▮ were sent and received via the address. Agents subsequently learned that due to a disagreement between FAJARDO, her co-conspirators, and one of the pilots this narcotics trip did not take place. Intercepts have since revealed that FAJARDO will re-organize after the New Year to finalize this trip.*

The February 5, 2014 affidavit also revealed that the Colombian government had been conducting a wiretap against a target of the United States investigation, who was alleged to have been in contact with defendant Fajardo near the commencement of the investigation. The information obtained by Colombia was shared with United States law enforcement and the affidavit summarized that contact as follows:

*The interceptions by Colombian law enforcement officials of* ▮ *have led to new information about his drug trafficking activities and provision of loads of cocaine to FAJARDO by aircraft, but* ▮ *is no longer communicating directly with FAJARDO on a regular basis, has not provided FAJARDO with any loads of cocaine within the past month, and, with the exception of the provision of a few loads of cocaine to FAJARDO since June 2011, operates independently of FAJARDO.*

In another surprising turn of events, the affidavit in support of the March 5, 2014 affidavit noted the Russian government was conducting a wiretap against members of the same criminal organization. The affidavit explains that:

*Russian law enforcement agents initiated the judicially authorized interception of communications over a device used by FNU LNU, also known as* ▮*, on October 24, 2013.* ▮ *has been identified as a drug trafficking associate of* ▮ *who [is alleged to be an associate of Luz Fajardo Campos and] traffics large quantities of cocaine and methamphetamine into Russia.* ▮ *drug trafficking activities, however, are not yet known to extend into the United States.*

3. **Initial Application And Extensions For Target Device 17**

On April 17, 2014 – one year after the interception of the defendant's telephone began – the Government asked the authorizing court in Arizona for permission to intercept Target Device #17, which it claimed she was now using in furtherance of drug trafficking activities, in lieu of Target Device #7. The agent affidavit in support of the application continued to assert – with exactly the same language as used in the original application for Target Device #1 – that the interception of the new device was "necessary" for investigators to uncover the full scope of the alleged conspiracy. At the time this representation was made, the number of target devices had increased from two blackberry devices to nineteen and the list of targets exceeded thirty persons.

The initial application was granted and the Government sought and was thereafter granted extensions to continue the interception of Target Device #17 on May 6, 2014; June 3, 2014; June 30, 2014; July 31, 2014; and August 27, 2014; and September 25, 2014.

The affidavits in support of these intercepts make abundantly clear that this investigation had already obtained an astonishing amount of raw data, but yet the investigating agents

continued to press forward with the wiretap, despite the marginal returns that additional interceptions would yield. For example, the original affidavit in support of intercepting Target Device #17 identified more than forty-three (43) airplanes that were *"potentially being utilized to traffic narcotics for the [drug trafficking organization]."* Nonetheless, the agent averred that continued interception of Target Device #17 was necessary to identify the defendant's *"procurement of aircraft to use in transporting illegal drugs from South American drug source countries and Central American transshipment points into Mexico."*

The extensions for Target Device #17 also reveal that a wiretap was not necessary to conduct an investigation against defendant Fajardo Campos. For example, the affidavit in support of the June 30, 2014 extension indicated that the Government had obtained an additional search warrant on May 15, 2014 for the defendants' alleged email account and that agents were *"currently processing the contents of FAJARDO's email for evidence of drug trafficking."* Moreover, the agents had also *"recently identified another email account* ██████████ *utilized by FAJARDO and are in the process of preparing a search warrant for its contents, which agents believe will reveal additional information about FAJARDO's trafficking activities."*

In the August 27, 2014 affidavit, the agent reported that the results from the search warrant of the defendant's new email account had been received and analyzed.

> *Agents have completed processing the contents of FAJARDO's email. Agents were able to identify various financial related documents related to the company* ████████. *Agents are exploiting these documents to the fullest extend in an effort to gain further evidence to assist in seizing assets related to the DTO's narcotic trafficking activities. Agents were also able to identify several corrupt law enforcement officials which FAJARDO is attempting to place in new law enforcement positions in an effort to advance the Sinaloa cartel's narcotic related activities. Agents also acquired insurance paperwork and registrations of aircraft previously intercepted on FAJARDO's BlackBerry devices. Agents will exploit the evidence gained to assist in the investigation into FAJARDO and her coconspirators.*

It is clear in the context of this investigation that the use of "traditional" law enforcement techniques was more than sufficient to obtain more than enough information against the defendant and her putative co-conspirators to understand the workings of the alleged conspiracy and to bring criminal charges.

**4. Renewed Interception of Target Device #7 and Extensions**

On October 23, 2014, the Government requested that the district court in Arizona approve the renewed interception of Target Device #7, alleging that defendant Fajardo Campos had indicated her intention to resume use of this device. The affidavit in support of this request stated – in unequivocal terms – that the interception of this device was *"necessary to enable the government to achieve the objectives of this investigation."* At the time this representation was made, the Title III wiretap had expanded to capture the electronic communications from thirty-three target devices and had identified more than eighty (80) individuals (by full name, alias, or only by their Blackberry screen name) as targets of the interception. Given the volume of conversations reported in the Title III applications, it is likely that the prosecutors and agents in this case had intercepted more than ten thousand messages during the life of the wiretap.

In addition, law enforcement had achieved serious operational success against the targets of the investigation, including: (1) the seizure of an airplane by Honduran National Bureau of Special Investigations in April 2014, under suspicion of narcotics trafficking; (2) the April 2014 arrest of an alleged co-conspirator in Mexico City in connection with an investigation targeting methamphetamine laboratories; (3) the January 14, 2014 seizure of an F350 pick-up truck in Mexico carrying three barrels with 146 kilograms of methamphetamine; (4) a search warrant executed on January 17, 2014 at a business in Mexico City that resulted in the seizure of 16 barrels of chemicals and specialized equipment used in the processing of precursor chemicals;

(5) a subsequent search warrant executed at a warehouse in Mexico City on January 21, 2014 that led to the arrest of 5 individuals suspected of selling synthetic drugs; (6) the search and seizure on February 13, 2014 of two laboratories in Mexico City where an additional one hundred and four kilograms of methamphetamines, other drugs, and nineteen persons were arrested; (7) the May 21, 2014 seizure of approximately twenty-two tons of marijuana and fourteen kilograms of methamphetamine near San Luis Colorado, Mexico; (8) on July 5, 2014, elements of the Mexican Military identified a warehouse located Culiacan, Sinaloa, Mexico believed to be associated with a co-conspirator and a search of the building led to the seizure of approximately 15 tons of marijuana; (9) based upon information from the wiretap, on June 29, 2014, the Honduran National Police stopped a tractor trailer, located a false compartment in the vehicle and seized approximately 378 kilograms of cocaine; and (10) from November 1, 2014 to December 1, 2014, elements of the Mexican Army conducted enforcement operations in the state of Durango against marijuana and poppy fields controlled by targets of the investigation, which resulted in the destruction of approximately 381,000 marijuana plants (the equivalent of approximately 381,000 pounds of marijuana).

Nonetheless, the Government claimed that it was "necessary" to resume the wiretap against Target Device #7, repeating verbatim its boilerplate assertion:

> *Interception is necessary because the TARGET SUBJECTS have demonstrated that they are members or associates of an organization that is actively involved in international drug trafficking, and monitoring communications is necessary for investigators to gain an understanding of the inner workings of the organization, the manner in which crimes are committed, and the identities of the participants in the organization.*

The request to resume interception of Target Device #7 was granted and ten extensions of the interception were submitted on November 20, 2014; December 18, 2014; January 14, 2015; February 12, 2015; March 12, 2015; April 9, 2015; May 7, 2015; June 2, 2015; July 1, 2015; and

August 3, 2015. In total, the interception against the defendant's alleged blackberry devices lasted for twenty-nine months.

The events of the ultimate ten months of the wiretap confirm that the continued interception of the defendant's communications was not necessary. First, the DEA continued to intercept and review an email account that they believe was being used by the defendant. In the January 14, 2015 affidavit, the agent represented that:

> *recently intercepted messages regarding FAJARDO utilizing* ▮▮▮▮▮▮*hotmail.com to assist in obtaining documents for pilots and aircraft which will be utilized to move a bulk shipment of cocaine from South America to Mexico. Agents have draft a search warrant and will go before the judge in an effort to gain actionable intelligence and evidence to assist in the indictment of FAJARDO. Agents will exploit the evidence gained to assist in the investigation into FAJARDO and her coconspirators*

Moreover, in the May 7, 2015 affidavit, the Government revealed that it had two additional confidential informants who were communicating directly with the defendant. According to the affidavit:

> *Agents have recently learned of A DEA confidential source ("CS-6") who is assisting the DEA* ▮▮▮▮▮▮ *office in an independent investigation into an Arizona based drug trafficker. Agents have learned the CS-6 has been in contact with FAJARDO via phone text messages on a limited basis. Agents have verified that CS-6 is not communicating with FAJARDO via blackberry messenger. CS-6 was introduced to FAJARDO via text messages by an unknown third party. CS-6 stated he/she only knows FAJARDO as "Jeni" and has never met her in person.*

In addition, the authorizing court was advised that:

> *Agents have learned of a DEA confidential source ("CS-7") who is assisting the DEA* ▮▮▮▮▮▮ *office in an independent investigation into Mexican and Central American drug traffickers. Agents learned that in March of 2015, CS-7 met in person with FAJARDO in Mexico City. Agents have learned that FAJARDO discussed her drug trafficking operations with CS-7. During this meeting, FAJARDO explained to the CS that she works under the direction of* ▮▮▮▮▮▮▮▮▮▮ *Agents coordinated with CS-7's controlling agents and made arrangements to travel to meet with CS-7 and the controlling agents to gain additional information pertaining to this meeting. Agents learned from CS-7 that FAJARDO intends to establish a cocaine trafficking route from South America to Mexico via boat. CS-7 was informed by FAJARDO that she was*

*attempting to establish this drug trafficking route under the direction* ███████████
███████████████████

After a nearly two and a half year wiretap investigation, with the interception of thousands of the defendant's communications, the affidavit submitted to the reviewing court concludes (without a hint of irony) with the following statement:

> ***Agents believe CS-7 may be able to assist in bringing an indictment forward against FAJARDO*** *(emphasis added).*

In fact, despite the depth and breadth of the wiretap investigation, the seizures related thereto, and all the other evidence in the Government's possession, the Indictment in this case was not returned until more than a year later, on August 30, 2016. See DE I (Indictment).

## LEGAL ANALYSIS

### A. The Wiretap Of The Defendants Target Devices Was Not "Necessary" And The Interceptions Must Be Suppressed

The issuance of federal wiretaps is governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Wiretap Act"), 18 United States Code Section 2510 *et seq*. The statute prohibits the interception of electronic communications unless the Government can establish that:

> (1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses; (2) probable cause exists to believe that "particular communications concerning that offense will be obtained" through an interception; (3) **"normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried";** and (4) probable cause exists to believe that the communication facility sought to be wiretapped "[is] being used, or [is] about to be used, in connection with the commission of [the] offense."

See, e.g., United States v. Donovan, 429 U.S. 413, 435 (1977)(emphasis added).

The determination that "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," is referred to as the "necessity requirement," which the Court of Appeals has held is the "keystone of congressional

regulation of electronic eavesdropping." <u>United States v. Williams</u>, 580 F.2d 578, 587–88 (D.C.Cir.1978). Congress created the necessity requirement to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." <u>United States v. Kahn</u>, 415 U.S. (1974). The necessity requirement "exists in order to limit the use of wiretaps, which are highly intrusive." <u>United States v. Bennett</u>, 219 F.3d 1117, 1121 (9th Cir.2000)(internal quotations omitted).

Accordingly, in this jurisdiction, the courts have given "close scrutiny to applications challenged for noncompliance and have rejected generalized and conclusory statements that other investigative procedures would prove unsuccessful." <u>United States v. Carter</u>, 449 F.3d 1287, 1293 (D.C. Cir. 2006). Although the courts have granted law enforcement some flexibility in the context of a conspiracy case when "traditional investigative techniques have proven inadequate," <u>United States v. Scurry</u>, 821 F.3d 1, 17 (D.C. Cir. 2016), the mere fact that a conspiracy is under investigation does not obviate the need for traditional law enforcement techniques. Likewise, the necessity requirement must be satisfied independently both as to each initial application to intercept a target device as well as each and every request to extend the wiretap. <u>United States v. Ford</u>, 183 F.3d 22, 28 (D.C. Cir. 2016). The failure to satisfy the necessity requirement precludes the Government from using the intercepted communications at trial. <u>United States v. Scurry</u>, 821 F.3d 1 (D.C. Cir. 2016)(Title III includes its own "exclusionary mandate"). <u>Accord</u> 18 United State Code Section 2515 ("no part of the contents of such intercepted communication and no evidence derived therefrom may be received in evidence in any trial. . . if the disclosure of that information would be in violation of [Title III]").

In this case, even assuming *arguendo* that the Government satisfied the other statutory requirements of Title III, the electronic interceptions obtained from defendant Luz Fajardo

Campos must be suppressed.[3] As set forth herein, any independent review of the representations made in the four corners of the affidavit in support of the wiretaps demonstrate that the interception was not necessary from the outset, nor continuing through its various twenty-nine month long lifespan. Unlike other cases challenging the necessity of a wiretap, where defendants claim that the Government did not attempt traditional investigative measures, or did not share the results with the issuing court, in this case the Government catalogued with great specificity its efforts. Unfortunately, it is clear from the record that the Government minimized, discounted, or ignored the efficacy of these traditional law enforcement techniques in what appears to have been an almost perpetual wiretap of electronic communications.

As an initial matter, the affidavit in support of the April 24, 2013 request to initiate the Title III interception against Target Device #1 notes that the Government had not one - but two informants - that were in "*active contact*" with the defendant.[4] Moreover, confidential informant #1 was in communication with the defendant via Target Device #1, before the Title III wiretap in this case ever commenced. Indeed, the affidavit notes that contact between CS-1 and the defendant was not coincidental, but rather it was "*at the direction of agents, [that CS-1 was in contact] with FAJARDO over TARGET DEVICE #1.*

According to the April 24, 2013 affidavit, the messages exchanged between the defendant and CS-1 in March 2013 concerned "*a payment to a member of the Mexican navy, the "Seals," in exchange for assistance in coordinating illegal drug shipments and apprehending drug traffickers in her area not affiliated with the Sinaloa Cartel.*" The subject matter of the

---

[3] The defendant is an "aggrieved person" within the meaning of the statue because her phone calls were intercepted and thus, she has standing to challenge the Title III interception. <u>See</u> 18 U.S.C. 2518(10)(a).

[4] For the limited purpose of the pending motion to suppress, the defense assumes the truth of the matters asserted in the affidavits submitted in support of the wiretap applications.

conversation reveals a high level of trust between the defendant and the cooperator and certainly portends the prospect of additional communications as to other related drug trafficking activities. There was no representation in the affidavit that the contact had ceased. But instead of allowing the relationship to develop and determining whether additional information could be obtained through the use of this confidential informant (that would have obviated the need for a wiretap), the Government simply rushed to the district court in Arizona.

The other representations in the initial wiretap application validate this conclusion and demonstrate that the Government had other traditional law enforcement techniques available to it before the wiretap ever began. For example, the DEA used the information provided by CS-1 concerning the defendant's telephone number to obtain a court authorized "pen register," which revealed that twenty-nine other blackberry devices were in contact with Target Device #1. The affidavit makes no mention as to what effort, if any, the DEA made to determine the users of these other devices.

In addition, as noted, the Mexican government had been conducting a wiretap against the defendant since October 24, 2012, had intercepted numerous telephone conversations involving the defendant, and was sharing the information with the DEA. Mexican law enforcement authorities had also conducted surveillance of the defendant when she allegedly met with Colombian drug traffickers, had taken photographs of the subjects and provided them to the DEA. The sharing of information between and among different law enforcement agencies is of course a staple of traditional law enforcement methodology.

Moreover, as the result of the Mexican wiretap, the DEA identified some of the defendant's alleged co-conspirators who were involved in money laundering. Again, using traditional law enforcement techniques, the United States Customs and Border Protection Service

notified the DEA when these targets entered the United States and agents surveilled them in the cities of Tucson, Casa Grande, and Tempe, Arizona, apparently without detection.

And if all of these events were not sufficient to conduct an investigation of the defendant's activities, in January 2013 – again, before the Title III interceptions commenced - the DEA obtained a search warrant for the defendant's email account, which allegedly confirmed that she was involved in drug trafficking. The affidavit in support of the initial Title III wiretap notes that the emails established that the defendant was attempting to obtain pilots and airplanes to transport drugs from South America to Mexico. Notably, the affidavit makes no mention as to whether the agents were considering how best to exploit the information obtained from the email search to further their investigations, for example, by seeking additional email search warrants or conducting an investigation into the pilots and/or aircraft. Likewise, there is no explanation to the issuing judge as to how or why such traditional law enforcement techniques were unlikely to succeed. Rather, there was simply the boilerplate, facile assertion that:

> *While information provided by confidential sources and judicially authorized interceptions in Mexico have furthered this investigation, the identities and residences of all of TARGET SUBJECT co-conspirators in Mexico and other countries, as well as the identities of associates who are, according to toll data, in contact with the users of the TARGET DEVICES, are unknown, and it is anticipated that information obtained from the interception of the TARGET DEVICES will assist law enforcement with identifying them.*

The test for obtaining judicial permission to conduct a Title III wiretap, however, is emphatically not whether "*information from the interception of the TARGET DEVICES will assist law enforcement with identifying*" other targets of the investigation. The statue requires that the Government establish that a wiretap is *necessary* to achieve this result. The Government in this case catalogued all of its traditional law enforcement efforts and then despite the fact that there were: (1) informants in contact with the defendant; (2) a judicially authorized wiretap in Mexico; (3) surveillance in Mexico and (4) the United States; (5) the results of a pen register;

and (5) information from an email search warrant, the Government blithely asserted that a Title III interception was still necessary.

An examination of the continuing arc of the wiretap confirms the conclusion that it was not necessary – particularly as it pertains to defendant Fajardo Campos. First, the length of the wiretap was extraordinary; its twenty-nine month existence is more than twenty times the national average. [5] As the seasons moved from Spring to Summer to Fall to Winter and back again more than twice, the agents continued to monitor the defendant's telephones. It would be fair to say that by the time the wiretap commenced the government had enough evidence to charge the defendant, but even if diligent agents could reasonably have wanted more evidence, the cooperators, the Mexican wiretap, the email search, and the opportunity for surveillance continued to exist. But there was more.

Independent of the wiretap, in August 2013, CS-1 met with "*FAJARDO and her associates in Mexico City.*" CS-2 was also allegedly in contact with the defendant requesting "*assistance regarding aircraft purchases for the purpose of transporting illegal drugs*." Several months later the United States would learn that Colombia was conducting an interception of the defendant's telephone and the information was being shared with the DEA. And in keeping with the notion that when it rains it pours, the DEA would learn soon thereafter that Russia was conducting a wiretap against alleged members of the conspiracy. Even if only some of these matters were reasonably foreseeable, there was still every reason for the Government to acknowledge that traditional law enforcement techniques would almost certainly result in the acquisition of substantial additional evidence in the investigation. According to the affidavits submitted to the court, the DEA had been investigating the defendant since 2012; the

---

[5] A report prepared by the United States Courts indicates that in 2017, the average length of a federal wiretap was 43 days. See http://www.uscourts.gov/statistics-reports/wiretap-report-2017.

Government never claimed that there was some urgency to conduct a Title III wiretap and given that the wiretap continued for almost two and a half years thereafter, no principled argument exists that in April of 2013, traditional investigative techniques were not sufficient to advance the goals of the investigation against defendant Fajardo Campos.

In the larger context of the case, it seems abundantly clear that no amount of evidence was ever going to convince the Government that either traditional law enforcement techniques would be successful, or even that the wiretap had produced enough evidence so that it was no longer necessary. The affidavit submitted in support of the May 2015 extension of Target Device #7 noted the existence of two additional cooperating witnesses; one of them was allegedly in direct contact with the defendant via text messaging and the other had allegedly met the defendant in person in Mexico City for the purpose of establishing a drug trafficking route. While many defendants have accused law enforcement agents of exaggerating in their judicial submissions, the Government's assessment of these latest events breathes life to the term "minimization." The agent concluded that these new developments *"may be able to assist in bringing an indictment forward against FAJARDO."* The assertion defies logic, but notwithstanding, the wiretap would continue against this defendant for an additional three months. Enough was never going to be enough.

## B. The Wiretap Violated Title III's Express Territorial Limitations

Title III expressly imposes a territorial limit on the ability of a federal judge to order the interception of electronic communications. The statute is clear and unambiguous on this point.

> Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving **interception of** wire, oral, or **electronic communications** within the territorial jurisdiction of the court in which the judge is sitting . . . .

18 United States Code Section 2518(3)(emphasis added). The term "intercept" is defined as "the aural or other **acquisition of the contents** of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 United States Code Section 2510(4)(emphasis added).

Under the limitation described above, a federal judge in Arizona would have lawful authority to order a wiretap only when the "interception" took placed in that judicial district. The interceptions in this case, however, took place in Texas.

As a general matter, the principle that there must be some territorial relationship between a criminal case and the location of the prosecution is inherent in the Constitution. As the Supreme Court has noted:

> Proper venue in criminal proceedings was a matter of concern to the Nation's founders. Their complaints against the King of Great Britain, listed in the Declaration of Independence, included his transportation of colonists "beyond Seas to be tried." 1. The Constitution twice safeguards the defendant's venue right: Article III, § 2, cl. 3 , instructs that "Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed"; the Sixth Amendment calls for trial "by an impartial jury of the State and district wherein the crime shall have been committed." Rule 18 of the Federal Rules of Criminal Procedure, providing that "prosecution shall be had in a district in which the offense was committed," echoes the constitutional commands.

United States v. Cabrales, 524 U.S. 1, 6 (1998). Territorial limitations on the power of the federal judiciary exist in other contexts in the criminal law. Thus, for example, a federal magistrate judge may only "issue a warrant to search for and seize a person or property located within the district . . . ." See, e.g., United States v. Kreuger, 809 F.3d 1109 (10th Cir. 2015)(affirming suppression of evidence seized in Oklahoma pursuant to search warrant issued by magistrate judge in Kansas).[6]

---

[6] Territorial limits also prevent forum shopping. In fiscal year 2015, the federal courts approved a total of 1,403 wiretaps. Of that total, the judicial district of Arizona approved 109, or slightly more than nine percent. http://www.uscourts.gov/statistics/table/wire-2/wiretap/2015/12/31.

Moreover, in <u>United States v. Glover</u>, 736 F.3d 509 (D.C. 2013), the Court of Appeals held that the territorial limitation contained in Title III prevented a federal judge in Washington, D.C. from authorizing the FBI to place an "audio recording device" in a vehicle located in Maryland. The Court of Appeals rejected the Government's argument advanced in the context of "wiretap" cases that the "interception" takes place at both the location of the recording device and where the conversations were first listened to. The Court of Appeals summarized the Government's position as follows:

> The government points to a handful of cases in which courts have found that an "interception" under Title III takes place at both the location of the listening post and at the location of a tapped phone. The government argues that in light of these cases, we should recognize that an issuing court has the power to authorize covert, trespassory entries onto private property, anywhere in the country, for purposes of placing surveillance equipment. The only jurisdictional limitation the government acknowledges is that the listening post must be located in the issuing court's jurisdiction.

736 F.3d at 514. The unanimous panel noted that "the statute does not refer to a "listening post," and concluded that "[w]hatever the merits of those [listening post] decisions, they do not address the issue before us." The evidence from the wiretap was therefore suppressed. [7]

In this case, the Government appears to have intentionally utilized a procedure that - on its face – runs afoul of the wiretap statute's territorial limitation. The April 24, 2013 affidavit in support of the initial request to intercept Target Device #1 explained the procedure that would be used throughout the wiretap.

> *Interceptions captured over the TARGET DEVICES are captured through Blackberry Corporation's server located in Texas. Blackberry subsequently sends the data automatically to the DEA Data Intercept Unit server located in Northern Virginia. Approximately every fifteen minutes, the DITU servers automatically forward the messages to specialized equipment located at the DEA Tucson, Division, where the*

---

[7] The D.C. Circuit would later adopt the so called "listening post" theory as it pertains to the interception of wire communications; that is, when a human voice is captured. <u>See</u> <u>United States v. Cano-Flores</u>, 796 F.3d 83, (D.C. Cir 2015)(and cases cited therein).

*messages are first received and reviewed by law enforcement agents and/or foreign language interpreters under law enforcement supervision.*

Under this procedure, the electronic communications were "captured," that is, "intercepted," in Texas. As such, the issuing judges in Houston – as in the *Glover* case – violated a specific requirement of Title III and the defendant's intercepted electronic communications must be suppressed. [8]

## CONCLUSION

The defense does not ask for the remedy of suppression of the wiretaps in this case lightly. But the clear statutory language and relevant caselaw compels the conclusion that the electronic communications in this case were "unlawfully intercepted" and must be suppressed.


Respectfully submitted,

*Robert Feitel*

_____
Robert Feitel, Esquire
Law Office of Robert Feitel
3509 Connecticut Avenue, N.W.
Washington, D.C. 20008
D.C. Bar No. 366673
202-450-6133 (office)
202-255-6637 (cellular)
RF@RFeitelLaw.com

---

[8] None of the submissions to the Arizona federal court noted the jurisdictional limits imposed by Title III. No argument was ever presented to the issuing court that the Government was seeking to expand the "listening post" theory to the interception of "electronic communications." Despite having two and a half years to do so, the Government never alleged that "capturing" the conversations in Texas was somehow different than "intercepting" them. Although the affidavits note that the electronic communications would be "*first received and reviewed*" in Arizona, those terms appear nowhere in the wiretap statute. Undersigned counsel has not found any reported case where the listening post theory was applied to the interception of electronic communications.

<u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a copy of the foregoing was sent via ECF, to Cole Radovich and Anthony Aminoff, Narcotic and Dangerous Drug Section, 2 Constitution Square, N.W. Washington, D.C. 20005, this 30th day of August, 2018

*Robert Feitel*

_____

Robert Feitel